Filed 8/27/14  Buddha Voice Broadcasting Alliance v. Sioeng CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BUDDHA VOICE BROADCASTING ALLIANCE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> YOPIE SIOENG et al., <br><br> Defendants and Respondents. | B249055 <br><br> (Los Angeles County <br> Super. Ct. No. BC479414) |

Appeal from an order of the  Superior Court of Los Angeles County, Ruth Ann Kwan, Judge.  Affirmed.

Law Offices of Gary Hollingsworth and Gary Hollingsworth for Plaintiffs and Appellants.

Emilio Law Group, Daniel G. Emilio, Kyle J. Waldie and Laurie M. Cortez for Defendants and Respondents.

———————————

Plaintiff Huei Chin Yang (Yang), a Buddhist, wrote an article about the contemporary Buddhist leader H.H. Dorje Chang Buddha III that ran in a local Southern California Chinese newspaper, the International Daily News, in July 2011. Later that month, the article was republished in a newspaper published in China, the People's Daily Overseas Edition. Plaintiffs' third amended complaint (TAC) asserted claims for defamation and fraud, alleging that both newspapers, after initial publication of the article, published defamatory statements about the article that it was an "advertisement" and "illegal[ly]" placed in the People's Daily Overseas Edition. The trial court granted defendants' special motion to strike under Code of Civil Procedure section 425.16,[1] finding that the article concerned a matter of public interest and that plaintiffs could not establish a reasonable probability of prevailing on the merits of their claims. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. *The Parties and Plaintiffs' Article*

Plaintiff Buddha Voice Broadcasting Alliance (BVBA) is an organization that disseminates news and information concerning Buddhism in California and worldwide. Yang, a devout Buddhist, is the principal officer and director of BVBA. Yang has a Ph.D. in Mass Media from a prominent Taiwan university, and has taught college-level journalism in Taiwan. The International Buddhism Sangha Association (IBSA), based in San Francisco, is an organization that presents the World Buddhist conferences held in Hong Kong. These conferences are a significant event for Buddhist followers worldwide, and IBSA's 2011 World Buddhist Conference conducted in Hong Kong on August 7, 2011 "was attended by more than 8,000 people representing 6,000 Buddhist organizations and groups worldwide. One of the main themes of the [c]onference was to

---

[1] All statutory references herein are to the Code of Civil Procedure unless otherwise noted. Section 425.16 is known as the "anti-SLAPP statute." The acronym SLAPP stands for Strategic Lawsuits Against Public Participation, a meritless suit designed to chill the defendant's exercise of the constitutional rights of free speech and to petition the government for redress of grievances. (§ 425.16, subd. (a); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)

2

announce the first Buddha in . . . [2,000] years to be recognized in accordance with the dharma[:] . . . H.H. Dorje Chang Buddha III."

As a result, "IBSA . . . asked [Yang] to contribute a factual article, entitled 'H.H. Dorje Chang Buddha III has been Truly Recognized in Accordance with the Dharma' . . . about this Buddhist leader in local Chinese papers in Southern California, and . . . [to] distribute[] [the article] to attendees at the [c]onference." In the article, Yang interviewed some Buddhist leaders about the status of H.H. Dorje Chang Buddha III, and reported on "recent incidents reflecting on the recognition of [H.H. Dorje Chang Buddha III's] positive contributions to art and philanthropy, including the award of the World Peace Prize in 2010 . . . and the closing of a three-year investigation into him by Interpol." According to Yang, the article "was a factual report about how [H.H. Dorje Chang Buddha III] endured suffering by withstanding long-term persecution by the Chinese government for his religious activities."[2]

Defendant International Daily News, owned by defendant Ted Sioeng, publishes a Chinese language daily newspaper, the "International Daily News," that is distributed throughout Southern California. Yopie Sioeng, who is Ted Sioeng's son, is the general manager of International Daily News. International Daily News is part of a group of newspapers under the ownership and management of Sioeng.

Defendant People's Daily is a Chinese company that publishes a newspaper of general circulation in China that is printed and distributed worldwide, including Los Angeles County, and is also distributed in an electronic version accessible on the internet. People's Daily publishes 10 newspapers, including People's Daily Overseas Edition. According to its website, People's Daily is the most influential and authoritative newspaper in China, and is widely considered to represent and publish the official policy of the Chinese Communist Party and the Chinese government. The Chinese Communist Party and the Chinese government exercise strict media control over the contents of

---

[2] The record contains an uncertified translation of the article from its original language, Mandarin, into English.

People's Daily and all of its subsidiaries, including People's Daily Overseas Edition and the International Daily News. People's Daily permits only its official version of the news to run in its paper, as well as in the People's Daily Overseas Edition and the International Daily News. People's Daily has a circulation of three million and is closely watched and read for insight into the official views of the Chinese government.

The editor in chief of People's Daily Overseas Edition is Zhang De Xiu (Zhang). Zhang resides in China. Zhang was responsible for reviewing, editing, and approving any published materials in the People's Daily Overseas Edition to ensure compliance with the editorial policy of People's Daily and the Chinese government. To republish articles in the People's Daily Overseas Edition, the International Daily News must obtain full approval from Hai Tian Development USA, Inc. (Hai Tian), a New York corporation with its primary place of business in New York, New York. Hai Tian is the chief publication and printing agency of People's Daily Overseas Edition.

2. *Publication of the Article and Defendants' Statements*

(A) JULY 9, 2011 PUBLICATION IN THE INTERNATIONAL DAILY NEWS

On July 9, 2011, the article was published in the International Daily News's print edition on page 12, and 1.2 million copies of the article were shipped upon plaintiffs' request. The article also appeared on International Daily News's website.

According to defendants, Yopie Sioeng does not personally approve of the content of articles. Instead he relies on Zhang to make such decisions. "In early July 2011, . . . Yang approached [Yopie Sioeng] about placing an advertorial in [the] local International Daily News paper . . . [and] on [the] website." Yang stated that she represented the IBSA and wanted to promote an article on its behalf, and promised that the IBSA would purchase 1.2 million copies of the paper.

To that end, on July 8, 2011, IBSA and International Daily News entered into a printing agreement in which IBSA agreed to purchase 1.2 million copies of the article at a cost of $75,000 "in exchange for allowing [IBSA] to place a one-page advertisement content on the final page."

4

According to Yopie Sioeng, International Daily News never retracted the article or issued correction statements about it.

(b)    JULY 28, 2011 PUBLICATION IN THE PEOPLE'S DAILY OVERSEAS EDITION

On July 26, 2011, Yang requested that Yopie Sieong reprint the article in the People's Daily Overseas Edition. Yopie Sioeng explained that he would have to seek permission from the New York office (Hai Tian and Ted Sioeng) to do so, and according to Yang, Yopie Sieong informed her the New York office had approved the article for publication. Although Yopie Sieong had not yet obtained such approval, Yang began working with Alice Li, the Chinese editor of People's Daily to prepare the article for publication in the People's Daily Overseas Edition. Yang told Li that Yopie Sioeng had approved the article, and Li agreed to place the article in the People's Daily's print edition and website. However, Yopie Sioeng subsequently learned that the request to print the article in the People's Daily had been denied.

On July 28, 2011, the article was published on page 8 of the People's Daily Overseas Edition. Page 8 of the People's Daily Overseas Edition is devoted to cultural, historical or literary topics. Shortly after the article was published on July 28, 2011, Yopie Sioeng and Yang met in person. Yopie Sioeng told Yang he would reprint five million copies pursuant to the parties' previous contract, which Yang estimated would cost $350,000. Sioeng would only reprint the article without the logo of People's Daily, but Yang would not agree to do so because that would imply that the article was not genuinely published by the People's Daily Overseas Edition. Yang claims she further told defendants she would not publish the article as an "advertisement."

Plaintiffs denied there was an advertising contract for the July 9 and 28, 2011 publication of the article. Further, Yang disputed that she unilaterally forwarded the article to the People's Daily Overseas Edition's Chinese office and represented to People's Daily Overseas Edition that the necessary approval for publication had been

5

obtained, or that she agreed the article was an "advertisement." Yang asserted the article was removed because of a plan by defendants to discredit plaintiffs.

(c) AUGUST 4, 2011 CORRECTION NOTICE

On August 4, 2011, just before the August 7, 2011 World Buddhist Conference in Hong Kong, defendant International Daily News published a correction announcement on its website that stated, "[t]here was a mistake with respect to the July 28th advertisement page that appeared on this page. It has been removed. We hereby specially issue this announcement." The source of the announcement was International Daily News, and it was understood by defendants and the attendees of the Buddhism conference that the announcement referred to the article. Plaintiff immediately asked Yopie Sioeng and Ted Sioeng to retract the correction announcement. Defendants did not retract the correction announcement.

During the World Buddhist Conference on August 7, 2011, Yang was questioned by attendees whether she misrepresented the facts of the article or whether it was merely an advertisement as stated by defendants because the sudden removal of the article from the website of the International Daily News, along with the incorrect description of the article as an advertisement, caused the attendees of the conference to question the veracity of the article, as well as the honesty and moral conduct of plaintiff.

Yang asserted that defendants' course of conduct was a combined and calculated effort to smear Buddhism and the Buddhist leader and was tantamount to continued persecution of H.H. Dorje Chang Buddha III.

(d) THE SEPTEMBER 10, 2011 ANNOUNCEMENT

On September 28, 2011, People's Daily Overseas Edition issued an announcement on page 2 of its print edition and website that stated, "'On July 28th of this year, . . . our newspaper's printing agent in Los Angeles, USA replaced the content of page eight of the People's Daily News Overseas. The agent published the Article "H.H. Dorje Chang Buddha III Has Been Truly Recognized in Accordance with the Dharma" under the name of the People's Daily Overseas Edition, which has caused an extremely bad effect. Thus,

6

our newspaper solemnly announces that usurping the name of the People's Daily to print and disseminate any publicity material is illegal.  Our newspaper will, according to the law, investigate this matter and hold responsible whoever did this.  For the correct content of the July 28th People's Daily Overseas Edition, please check the "People's Daily News Chain" at the People's Daily Online.'"

Plaintiffs assert the announcement defamed plaintiffs because persons who know plaintiffs, including but not limited to adherents of Buddhism worldwide, were aware that plaintiffs had been responsible for writing and contributing the article, and the announcement charged plaintiffs with committing the crime of larceny and forgery; the announcement further charged plaintiffs with dishonesty or immoral conduct; and it had a natural and unavoidable tendency to injure plaintiffs in their business and occupation.

*3.    Plaintiffs' Complaint and Defendants' Motion to Strike*

Plaintiffs' operative TAC filed February 14, 2013 alleged claims for defamation and fraud against Yopie Sioeng and the International Daily News, and DOES 1 through 10.[3]  Plaintiffs sought $50 million in damages, punitive damages, interest and costs.

Plaintiffs' defamation claim alleged that on August 4, 2011, defendants published false and unprivileged statements intentionally and maliciously designed to harm plaintiffs' reputation by falsely characterizing plaintiffs' article as an advertisement.  In addition, the September 28, 2011 correction falsely stated that the article had been placed in defendants' publications through illegal means and plaintiffs had used the name of People's Daily's in an illegal manner.  The purpose of both announcements was to cause persons to cease doing business with plaintiffs and to injure or destroy plaintiffs' charitable, religious and fundraising work, and was tantamount to continued persecution of H.H. Dorje Chang Buddha III.

---

[3] The following defendants were added by amendment:  Ted Sioeng as "DOE 1," People's Daily as "DOE 2," People's Daily Overseas Edition as "DOE 3," Zhang as "DOE 4," and Hai Tian as "DOE 5."  The record does not indicate whether these defendants were served or whether they have appeared.  They are not parties to this appeal.

Plaintiffs' fraud claim asserted that Yopie Sioeng's July 2011 representation that he had the authority to publish the article in the People's Daily Overseas Edition was false. This disguised approval was made with the intent to convince plaintiff to rely and publish the article in the People's Daily Overseas Edition, and to permit People's Daily Overseas Edition and People's Daily to repudiate the article and falsely claim plaintiffs had participated in a scheme to place the article in the People's Daily Overseas Edition without authority, and "[d]efendants therefore seized the opportunity to smear Buddhism and H.H. Dorje Chang Buddha III, in continued persecution of the Buddhist leader."

Defendants filed a special motion to strike, arguing the TAC arose from protected activities, namely, public statements made on a public matter in a public forum. Further, plaintiffs could not establish a reasonable likelihood of prevailing on the merits because the statements were not defamatory: neither the article nor the correction statement mentioned plaintiffs; the correction statement was not false; defendants had no contractual obligation to run the article on their website; the term "advertisement" was a true statement because plaintiffs agreed the article was an advertisement; and plaintiff could not establish malice. In addition, plaintiffs' claim for fraud failed because it was based on plaintiffs' subjective belief that defendants engaged in a disguised conspiracy to deceive plaintiff into believing defendants had approved publication of the article, as a first step in a scheme to smear Buddhism.

Plaintiffs' opposition asserted that the lawsuit did not concern a matter of public interest because the contents of the article was not the gist of plaintiffs' lawsuit, but rather its characterization in the International Daily News as an "advertisement" and the statements about its illegal placement in the People's Daily Overseas Edition.

The trial court found that plaintiffs' TAC arose from protected activity and that plaintiffs could not establish a reasonable probability of prevailing on the merits. The court found plaintiffs' claims arose from protected activity because the article and correction announcement were published in newspapers and on a website, and further that the correction announcement was made in connection with a public issue or an issue

8

of public interest, namely, Buddhism and governmental persecution. In so finding, the court rejected plaintiffs' assertions that their claims were solely based on the retractions and involve a private dispute between plaintiffs and defendants.

The court found plaintiffs had not demonstrated a probability of prevailing on the merits. Plaintiffs' defamation claim failed because plaintiffs presented no evidence that the intended audience of the correction reasonably understood it to be about plaintiffs—there were no declarations from persons who read the article, only Yang's conclusory declaration. The September 28, 2011 Announcement that the article had been placed in defendants' publication by illegal means and the statement that the name People's Daily was used in an illegal manner were likewise not connected to plaintiffs. Lastly, plaintiffs' fraud claim failed because plaintiffs did not submit evidence of a conspiracy to smear Buddhism and H.H. Dorje Chang Buddha III, particularly since plaintiffs did not dispute that International Daily News originally published the article without incident on July 9, 2011.

## DISCUSSION

Plaintiffs argue that the issue is not a matter of public interest but is a private controversy whether the article was a feature or an advertisement and whether plaintiffs acted illegally in publishing the article in the People's Daily Overseas Edition. They assert that the defendants' defamatory statements were not about the contents of the article itself, but were made about plaintiffs, who are not public figures; further, defendants engaged in a conspiracy by which the July 9, 2011 publication was to convince plaintiffs that Communist Party newspapers accepted religious topics without problem, and the July 28, 2011 publication was to set up the trap by creating widespread interest in the article before the World Buddhist Conference on August 7, 2011, at which time defendants retracted the article by stating the article was an "advertisement" and was placed in the People's Daily Overseas Edition "illegal[ly]."

Defendants argue the statements come within the first prong of the anti-SLAPP statutes because the statements were made in a public forum on a public matter and the

9

People's Daily's statements were made in connection with an issue under review by the governmental authorities of China. (§ 425.16, subds. (e)(2), (3).) Further, they argued plaintiffs cannot prevail on the merits because the term advertisement is not defamatory and plaintiffs' allegations regarding defendants' motives were pure speculation.

## I. Standard of Review

Known as the anti-SLAPP statute, section 425.16 provides that a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Ruling on an anti-SLAPP motion is a two-step process. First, the trial court must determine whether the defendant has made a prima facie showing that the challenged cause of action arises from protected activity. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822.) If, and only if, the defendant makes that showing must the trial court proceed to the second step—determination of whether the plaintiff has shown a probability of prevailing on the claim. (*Ibid*.) The appellate court reviews a ruling on an anti-SLAPP motion de novo, using the same two-step process. (*Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1387; *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 478.)

Relevant here, subdivision (e) of section 425.16 delineates the type of speech or petitioning activity protected. Such acts include written or oral statements "made in a place open to the public or a public forum in connection with an issue of public interest"; or "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3), (4).) Courts have not precisely defined the boundaries of a cause of action "arising from" such protected activity. (§ 425.16, subd. (b).) *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 explained that "the statutory phrase 'cause of action . . . arising from' means simply that the defendant's act

10

underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.  [Citation.]  In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech."

Whether the statute applies is determined from the "*principal thrust* or *gravamen*" of the plaintiff's claim.  (*Martinez v. Metabolife Internat., Inc*. (2003) 113 Cal.App.4th 181, 188.)  In making these determinations, the trial court considers the pleadings, and supporting and opposing affidavits.  (*Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 67.)  We review the trial court's ruling on the motion to strike independently under a de novo standard.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)  We do not weigh credibility, but accept as true the evidence favorable to plaintiff and evaluate the defendant's evidence only to determine whether it defeats the plaintiff's evidence as a matter of law.  (*Id*. at p. 326.)

## II.    First Prong:  Matter of Public Interest

### A.    *Public Forum*

We first turn to the question whether defendants' corrections of August 4, 2011 and September 28, 2011, respectively, were "made in a place open to the public or a public forum."  (§ 425.16, subd. (e)(3).)  We conclude both the newspaper and the Web site are places open to the public or public forums.

California Courts of Appeal disagree whether a newspaper is a public forum. (See, e.g., *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1161 [Gay and Lesbian Times "clearly qualifies as a 'public forum'"]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 478 [homeowners' association newsletter was a public forum]; *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1130–1131 [member association's newsletter was not a public forum]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co*. (1995) 37 Cal.App.4th 855, 863, fn. 5 [in dicta, dubious whether the San Francisco Chronicle newspaper was a public forum].)  The courts concluding a newspaper is not a public forum have relied on the fact that editors and publishers control

11

the content.  (*Lafayette Morehouse, Inc.*, at p. 863, fn. 5.)  We agree with *Damon*, at page 478, that a newspaper is a public forum.  "Read in context of the entire statutory scheme, a 'public forum' includes a communication vehicle that is widely distributed to the public and contains topics of public interest, regardless whether the message is 'uninhibited' or 'controlled.'"  (*Ibid.*; see *Nygord, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1038.)

A Web site accessible to the public is a public forum for purposes of section 425.16.  (See, e.g., *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4; *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1015; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 895.)  As observed in *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228:  "Statements on [defendant's] Web site are accessible to anyone who chooses to visit the site, and thus they 'hardly could be more public.'  [Citations.]"  (*Id.* at p. 1247 quoting *Wilbanks*, at p. 895.)  Although the content of the International Daily News and People's Daily Overseas Edition are strictly controlled, the newspapers at issue here are widely disseminated to the public and contain issues of public interest, while the Web sites can be viewed by anyone with access to the Internet.  Therefore, they are a public forum.

### B.      Matter of Public Interest

California's anti-SLAPP law provides no definition of "an issue of public interest."  As a result, courts have established guiding principles for what distinguishes a public interest from a private one:  (1) "'public interest'" does not equate with mere curiosity"; (2) "a matter of public interest should be something of concern to a substantial number of people"; "a matter of concern to a speaker and a relatively small, specific audience is not a matter of public interest"; (3) "there should be some degree of closeness between the challenged statements and the asserted public interest"—"the assertion of a broad and amorphous public interest is not sufficient"; (4) "the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy'"; and (5) "[a] person cannot turn otherwise

12

private information into a matter of public interest simply by communicating it to a large number of people." (*Weinberg v. Feisel*, *supra*, 110 Cal.App.4th at pp. 1132–1133.) The statement does not need to be serious or truthful in order to concern an issue of public interest for purposes of the anti-SLAPP statute. To so require would "read a separate proof-of-validity requirement into the operative sections of the statute," and would "'confuse[] the threshold question of whether the SLAPP statute [potentially] applies with the question of whether [an opposing plaintiff] has established a probability of success on the merits.'" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94.)

Here, plaintiffs' article about a religious figure (H.H. Dorje Chang Buddha III), who was being recognized by Buddhists worldwide as their leader, is a topic of public interest. Further, the context in which the article was published—two Chinese language newspapers, one of which was directly controlled by the Communist Party—is itself a matter of public interest. Thus, given this political environment in which the article was published, the fact that those papers chose to issue statements about the article's publication after publishing it became a matter of public interest. Consequently, plaintiffs' lawsuit is within the first prong of the anti-SLAPP statute.

### C.    Second Prong

Having concluded that defendants satisfied their burden of showing that section 425.16 applies, we next consider whether plaintiffs have demonstrated a probability of prevailing on their defamation and fraud claims. We conclude that they have not.

#### 1.    Defamation

Under California law, libel is "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)

13

Thus, to state a defamation claim, plaintiff must present evidence of a statement of fact that is provably false. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [711 L.Ed.2d 1, 110 S.Ct. 2695].) The dispositive question after the *Milkovich* case is whether a reasonable trier of fact "could conclude that the published statements imply a provably false factual assertion." (*Moyer v. Amador Valley J. Union High School Dist*. (1990) 225 Cal.App.3d 720, 724.) To ascertain whether the statements in question are provably false factual assertions, courts consider the totality of the circumstances. (*Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1191.) "'First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered. . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.'" (*Moyer*, at p. 724.)

Here, the August 4, 2011 statement that plaintiffs' article was an "advertisement" rather than a fact-based article reporting the news was not defamatory. Plaintiffs attempt to imbue the word "advertisement," normally a word without any pejorative sense, with defamatory meaning based on the context of its publication—the strict editorial environment of the International Daily News and People's Daily Overseas Edition. However, plaintiffs' argument is based upon the flawed premise that an advertisement is necessarily untruthful. Instead, it is paid content. Thus, what plaintiffs actually lament is the newspapers' failure to editorially sanction Yang's article; they did this by describing it as paid content, or, an "advertisement." The papers' failure to editorially sanction the article cannot form the basis of a defamation action. The same logic applies to the September 28, 2011 announcement. The People's Daily Overseas Edition, pursuant to plaintiffs' own admission, is controlled by the Chinese government and would not have accepted an article on H.H. Dorje Chang Buddha III for publication given the political environment. Thus, its editorial statements that the article was wrongfully placed in its paper cannot be the subject of a defamation action.

14

### 2. *Fraud*

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) Fraud must be pleaded with specificity rather than with "'general and conclusory'" allegations. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184.)

Here, plaintiffs cannot establish that they have a reasonable likelihood of establishing that defendants engaged in any fraudulent conduct. Plaintiffs' fraud assertions are based upon a nebulous conspiracy theory that they were lured into publishing their article in papers that are mouthpieces of the Chinese government and that after falling for the trap, Yang and BVBA were discredited. Aside from the fact these allegations lack sufficient particularity of deceitful conduct, the People's Daily Overseas Edition, pursuant to plaintiffs' own admission, is controlled by the Chinese government and would not have accepted such an article for publication given the political environment.

15

## DISPOSITION

The order is affirmed.  Respondents are to recover their costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16